UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELAINE CHAO,<br>Secretary of the United States<br>Department of Labor,<br><br>Plaintiff,<br><br>PLAN BENEFIT SERVICES, INC.<br><br>Defendants. | Civil Action No. 07-11474-DPW |

## DECLARATION OF TRAVIS WEST

1. My name is Travis West. I currently am the sole owner of Plan Benefit Services, Inc. ("PBS") and Fringe Insurance Benefits Inc. ("FIBI"). I have first hand knowledge of the following facts and if called to testify would state the following:

2. Since 1983, the Contractors and Employees Retirement Plan and Trust ("The Contractors Plan") has provided retirement benefits to employees in companies large and small all over the United States.

3. The Contractors Plan was originally designed for hourly workers of open-shop construction companies that contract with state and federal governments. The Contractors Plan has now expanded to encompass Service Contract Act employees and owners, salaried and office employees of any firm.

4. Over the years, the Contractors Plan has helped over 250,000 people save for retirement. The Contractors Plan currently services about 1,100 retirement plans and covers about 43,678 participants.

5. The Contractors and Employees Basic Plan Document, Master Plan Document No. 2, ("the Master Plan Document") is a master and prototype plan document that an employer may adopt to establish either: (1) a money purchase plan funded solely through employer contributions; or (2) a 401(k) profit sharing plan, funded by employee and possibly employer contributions, depending on the type of plan the employer wishes to establish by signing one of two Adoption Agreements. (Attachment 1, p.1; Attachment 1 is a true and correct of the Master Plan Document).

6. PBS is the successor in interest to the Associated Prevailing Wage Contractors, Inc. ("the Association"), the former sponsor of the Master Plan Document. On December 17, 2004, the Association agreed to transfer the sponsorship of the Master Plan Document to PBS. (Attachment 2 is a true and correct copy of the Agreement to Transfer Plan Sponsorship by and between Associated Prevailing Wage Contractors, Inc. and Plan Benefit Services, Inc.). The effective date of the transfer was set for January 1, 2005. As the successor in interest to the Association, it is the current sponsor of the Master Plan Document.

7. The IRS accepted the change as nothing more than a change in sponsor that did not affect the qualified status of the Master Plan Document and issued a new opinion letter reflecting PBS as the new sponsor of the Contractors Plan. (Attachment 3 is a true and correct copy of the January 6, 2005 IRS opinion letter).

8. One of the most critical responsibilities of any master and prototype plan sponsor is to ensure that the terms of the master and prototype plan documents, including the adoption agreements, comply with all Internal Revenue Code ("IRC") requirements, so that the Internal Revenue Service ("IRS") can issue a favorable opinion letter to the plan documents determining that the document complies with IRS requirements.

9. An IRS "favorable opinion letter" is a letter that states that the IRS approves the document for use in establishing tax-favored or "qualified" employee pension benefit plans.

10. The Master Plan Document was amended and timely submitted, on January 4, 2007, to the IRS for the required congressional amendments to the IRC, known as the Economic Growth and Tax Relief Act of 2001, ("EGTRRA").

11. On March 31, 2008, PBS received the favorable opinion letter for the EGTRRA updated Master Plan Document. (Attachment 4 is a true and correct copy of the 2008 IRS Opinion Letter).

12. PBS is also the current settlor of a Master Trust for which RSGroup Trust Company serves as the Trustee. (Attachment 5 is a true and correct copy of the Master Trust Agreement). PBS also serves as the Recordkeeper to the plans, that are established by Employers, as that term is defined *infra*. (West Dec. at ¶ Attachment 1, Article 1.98).

13. RSGroup Trust Company is the successor Trustee to Reliance Trust Company for the Master Trust. PBS selects the Trustee for the Master Trust.

14. Fringe Insurance Benefits, Inc. ("FIBI") is an insurance brokerage firm that markets retirement programs primarily to employers that are subject to the Davis-Bacon Act, Service Contract Act, or any other federal, state, or municipal Prevailing Wage Law, and that wish to establish either a money purchase pension plan or 401(k) profit sharing plan for their employees.

15. Presently, The Contractors Plan is funded with group annuity products offered through Transamerica Life Insurance Company and John Hancock Life Insurance Company.

16. Collectively PBS, FIBI, and RSGroup provide a turnkey pension arrangement that is known as "The Contractors Plan." These types of turnkey arrangements are commonly offered to the general public through large financial institutions like Fidelity, Merrill Lynch and Invesco as well as insurance companies like Massachusetts Mutual Life Insurance Company and Prudential.

17. Neither the Master Plan Document nor The Contractors Plan constitute an employee benefit plan within the meaning of Section 3(2)(A) of the Employee Retirement Income Security Act of 1974, *et. seq* (" ERISA"), 29 U.S.C. § 1002(2)(A).

18. Adoption Agreements are instruments commonly used with master and prototype plan documents, like PBS's Master Plan Document.

19. Employers that execute Adoption Agreements establish a stand alone employee benefit pension plan that is either a 401(k) profit sharing plan or a money purchase plan depending on which of two Adoption Agreements they choose to execute. (Attachment 1, Article 1.86). The term "Plan" as used in the Master Plan Document means the ERISA covered Plan established by an employer that executes one of two types of Adoption Agreements. (Attachment 1, Article 1.86).

20. An employer that enters into an Adoption Agreement adopts the terms of the Master Plan Document and becomes an "Employer" in The Contractors Plan as the term is defined in Article 1.82 of the Master Plan Document. (Attachment 1).

21. The Contractors Plan Adoption Agreements, like the adoption agreements of other master and prototype arrangements, allow employers to select certain IRS approved options that give employers limited flexibility to customize their Plan, e.g., employee eligibility

4

and matching contributions. (Attachment 6 is a true and correct copy of sample Adoption Agreements).

22. A Employer that has elected to make prevailing wage contributions to the Plan, must complete a Schedule A. (Attachment 7 is a true and correct copy of a sample Schedule A). An Employer that is subject to the Federal Davis-Bacon Act must also submit certified payroll statements to the United States Department of Labor, Wage and Hour Division swearing that they have paid the prevailing wage for the job classification in the jurisdiction in which it is performing work.

23. The Schedule A is used to list the projects and the employment categories and classifications on those projects that will have prevailing wage contributions made to the Plan. The Schedule A also shows the hourly contribution rate for each eligible employment classification and the effective dates that such contributions apply to hours worked on the project identified on the Schedule A.

24. The Schedule A is part of the Adoption Agreement. (Attachment 6, Article 10(a) and Attachment 7). Employers must complete a new Schedule A each time they contract for a new prevailing wage project. (Attachment 7).

25. If an Employer has selected specific job classifications, locations, and contribution rates (or other matters), to participate in the Plan and listed these on a Schedule A, changing or adding to those covered projects, eligible classifications or contribution rates (or other matters) is an amendment to the Plan. (Attachment 7).

26. In order to amend the Plan, the board of directors of a corporate, Employer must amend the Plan. (Attachment 7). If the board of directors of a corporate Employer has delegated

the authority to amend the Plan to a corporate officer, this officer may make the changes on the Schedule A without a meeting of the board. (Attachment 7). Similarly, an owner of a sole proprietorship or general partner of a partnership can amend the Plan by making the changes on the Schedule A. (Attachment 7).

27. In this litigation, the DOL seems to state that the Trustee has an inherent duty to monitor and collect contributions that the Employers are required to make to the single employer Plans that they each establish. (DOL Amended Complaint).

28. Unless the Trustee, or for that matter PBS, were to employ on-site agents and police the employers' daily business activities, neither PBS nor RSGroup Trust have any way of verifying the accuracy of the information on Schedule A.

29. In order for the Trustee to prudently discharge any such purported duty, the Trustee, at a minimum, would have to conduct weekly on-site audits of every Employers' payrolls. With roughly about 1100 employers participating in The Contractors Plan at any given time, the cost of this kind of policing would be enormous, impossible to price correctly, and due to the extra cost likely would preclude many small employers from being able to sponsor Plans.

30. Moreover, in most cases the weekly audits also would need to consist of checking contribution levels against the then-approved prevailing wage rates, which vary by state, business type, and worker classification.

31. As Employers hired new workers or added prevailing wage contract jobs, the monitoring would require constant vigilance to ensure that Employers were (1) timely revising the Schedule As; and (2) properly classifying the workers and paying the applicable prevailing

wage at the particular site in any given week depending on the geographic location of the worksite.

32. The DOL's desire to impose a duty to monitor and collect contributions on the Trustee to ensure that contributions are properly being paid to the Plans would literally require that the Trustee oversee how Employers conduct their business.

33. From a practical standpoint, this is the reason why the Master Plan Document places on the Employers, as Plan Administrators, the obligation to ensure that contributions are properly made to their stand alone.

34. Moreover, because of the seasonal and contractual fluctuations affecting the types of business that participate in The Contractors Plan, an Employer may remit contributions to the Plan in any given month is not necessarily a red flag that the Employer failed to transmit required contributions to its Plans.

35. There are many reasons why an Employer might not remit contributions to the Trustee in any given month. For example, an Employer might have ended the government project under which it was required to pay a fringe benefit under a Federal or State prevailing wage law and therefore no contributions would be owed to the Plan. The Employer might not have any workers subject to prevailing wage laws on any given job in that month or pay period in which case no contributions would be owing to the Plan. Alternatively, the Employer might decide to stop paying fringe benefits and pay cash in lieu of making the contribution, or the Employer might decide to contribute to another plan instead of The Contractors Plan. All of this activity is permissible under Federal and State prevailing wage laws.

36. Neither the Trustee nor PBS would have this information.

37. Unless a participant in a Plan complains that his or her account balance is being "shorted" or an Employer discloses shorting the Plan, the Trustee's and PBS's only means of knowing there is a problem with employer contributions is through information that it might receive from the DOL's Wage and Hour Division or the Employee Benefit Security Administration. Even then, PBS can not be certain that contributions are delinquent because the government's factual findings are not always correct. This latter point was recently demonstrated by the DOL's February 12, 2008 "voluntary compliance letter" to one of the Employers, PCM Construction Company ("PCM") and the litigation against Linskey.

38. With respect to PCM, upon closer inspection, the excel spread sheets that DOL provided alleging delinquent transmittals to the Plan were riddled with errors. (Attachments 8 is a true and correct copy of the DOL's February 12, 2008 letter to PCM; Attachment 9 is a true and correct copy of PCM's response).

39. In the case of Linskey Construction Company, the DOL originally alleged a $78,000 shortfall. (DOL original complaint). From the beginning, Linskey disputed the amount of the shortfall. The final consent order supports that the DOL's original figures were wrong, and that the reason Linskey failed to transmit the employer contributions to its Plan was because the company was, and apparently is, having financial trouble.

40. In its capacity as the settlor of the Trust, PBS defined the assets of the Trust and the Trustee agreed to accept the following as the assets of the Trust:

> all contributions and assets paid or delivered to it pursuant to all Plans established by all Employers and hold, invest, administer and distribute them in and from this single master trust, in accordance with this Master Trust. All legal rights, title and interest in and to the assets in the Trust Fund shall at all times be vested exclusively in the Trustee. Participants shall have no right, title, interest or claim in or to any part of the assets of the Trust Fund while this

8

> Master Trust continues in force, but shall be entitled only to share in the earnings, avails or proceeds of sale or other disposition of such assets, all in the manner and at time provided in the Plan and this Agreement, and not otherwise.

(Attachment 6, Article 1.01).

41. Under the Master Trust Agreement, the Trustee is "authorized to exercise all powers conferred upon the Trustee by law which it may deem necessary or advisable for the investment, management, control and protection of the Trust Fund." Including, among others, the authority:

> [t]o settle, compromise, or submit to arbitration any claims, debts, or damages due or owing to or from the Plan, to commence or defend suits or legal or administrative proceedings, and to represent the Plan in all suits and legal and administrative proceedings.

42. In addition, the Trustee is authorized "[t]o begin, maintain or defend any litigation necessary in connection with the administration of the Trust, except that the Trustee is not obliged or required to do so unless indemnified to its satisfaction." (Attachment 6, Article 1.06(p)).

43. Consistent with the definition of the Trust assets under the Master Trust Agreement, the Trust Agreement states that:

> [t]he Trustee shall be accountable for all contributions received by it, but shall have no duty to require any contributions to be made to it, or to determine that the amounts received comply with the Plan, or to determine that the fund is adequate to provide the benefits payable pursuant to the Plan.

(Attachment 6 Article 1.07(a)).

44. Consistent with the Master Trust Agreement, the Master Plan Document defines the duties of the Trustee as being:

> accountable to the Employer and Plan Administrator for the funds contributed to the Trust Fund by the Employer, but is not obliged to collect any contributions from the Employer. The Trustee does not have a duty to see that the contributions received comply with the eligibility, contribution rate or other provisions in the Plan.

(Attachment 1, Article 9.02).

45. This language clarifying that the Trustee has no duty to require contributions to the Trust or to determine whether amounts received in the Trust are correct is language that historically has been included in master and prototype pension documents as well as other types of pension arrangements that pool the assets of multiple plans in a collective trust vehicle.

46. In addition to being the sponsor of the Master Plan Document, PBS serves as the Recordkeeper for the Plans established by the Employers. (Attachment 1, Article 1.98). In that capacity, Article 8.03(a)(5) states, in relevant part, that the Recordkeeper:

> shall have no duty to require any contributions to be made to the Plan, to determine such amounts as may be payable to the Plan under its terms, to determine that the amounts received by the Trust comply with the Plan, or to take any steps to determine if contributions may be delinquent.

(Attachment 1, Article 8.03(a)(5)).

47. In its capacity as the master and prototype plan sponsor, PBS maintains the Master Plan Document to make sure that it complies with applicable state and federal laws.

48. Under the Master Plan Document, the Employers appoint the Trustee to serve as trustee over the Plans they establish. Article 9.01 of the Master Plan Document states:

> [b]y adopting this Plan, the Employer agrees to have such contributions as may be made hereunder contributed to the Contractors and Employees Retirement Plan Master Trust, a master trust the provisions of which, as amended from time to

time, are by reference incorporated in this Plan, and to be bound by
the terms of the trust agreement which governs such Trust.

(Attachment 1, Article 9.01).

49. Under the Master Plan Document, the obligation to ensure that proper contributions are paid to the Trustee belongs to the Employer. (Attachment 1, Articles 3.01-3.09 and Article 8.02; and Attachment 11, which is a true and correct copy of a Chapter titled "Contributions to the Contractors Plan" excerpt from the *Contractors Plan Employer Guide*).

50. Under Federal and State prevailing wage laws, employers are responsible for complying with those laws and ensuring that proper contributions to pension plans are made or any other bona fide employee benefit plan are made or cash in lieu of those.

51. Under the Master Plan Document, Employers are the "Plan Administrators" to the ERISA Plans that the Employers establish. (Attachment 1, Article 1.87).

52. Article VIII of the Master Plan Document describes the duties and obligation of a Employer in its capacity as the Plan Administrator. Among other things, the Master Plan Document states:

> t]he Employer shall make any contributions required under Article III of the Plan and shall maintain records, including payroll records, necessary to support such Employer Contributions.

(Attachment 1, Article 8.02(a)). It follows that if, under the Master Plan Document, the obligation to make the contributions to the Plans rests with the Employers, the obligation to monitor and ensure that delinquent contributions are made primarily rests on the Employer in its capacity as the Plan Administrator.

11

53. ERISA § 104, 29 U.S.C. § 1004, requires that employee benefit plans file an annual report. In practice, the requirement is fulfilled by filing a Form 5500 with the DOL. (Attachment 10 is a true and correct copy of the year 2005 Form 5500).

54. Under the Master Plan Document, Employers, in their capacity as Plan Administrators (assisted by PBS) are obligated to complete and file the annual report and ensure that the information contained therein is accurate. (Attachment 1, Article 8.02(e)). Article 8.02(j) of the Master Plan Document states:

> [t]he Employer shall, for any Plan Year in which an accountant's audit is required to be filed with the Form 5500, engage auditors and pay the associated audit fees for the auditing procedures that are performed on the Employer's records related to the Plan.

(Attachment 1).

55. The Form 5500 is signed by the Employer in its capacity as the Plan Administrator under penalty of perjury. (Attachment 10, p.1).

56. The DOL frequently modifies the requirements in the Form 5500, but consistently has not changed the fundamental requirement that a plan administrator answer, under penalty of perjury, that all *employee* contributions to a plan have been timely transmitted. (Attachment 10, Schedule H, Part IV, 4(a), for large plans; Schedule I, and Part II, 4(a), for small plans).

57. If the DOL, through an investigation, believes that timely *employee* contributions were not paid to a single employer plan, it will not hesitate to allege ERISA violations against the employer. (Attachment 8).

58. Schedule H and Schedule I of the Form 5500 additionally require plan administrators to answer whether there were any other nonexempt transactions between a plan

and a party in interest. (Attachment 10, Schedule H, Part IV, 4(d), for large plans; Schedule I, and Part II, 4(d), for small plans).

59. This question would capture any late *employer* contributions as opposed to late *employee* contributions to Plans.

60. If the DOL, in the course of an investigation, believes that an employer has failed to make employer contributions, it has demonstrated that it will not hesitate to allege ERISA violations against the employer. (DOL Original Complaint).

61. The Form 5500 also requires that sponsors of retirement plans, *e.g.*, money purchase plans, under penalty of perjury, disclose the minimum required contributions to the plan for that year and to enter the amount that was in fact contributed to the plan that year. (Attachment 1o, Schedule R, Part II, 6(a) and (b)).

62. As part of an investigation that it opened on The Contractors Plan in 1998, the Plan Benefits Security Division ("PBSD"), the Solicitor's Office division at DOL that exclusively litigates matters involving Title I of ERISA, served FIBI with a document request in 2001. FIBI produced the requested documents on or about March 15, 2001 and never heard from the DOL again after delivery of those documents.

63. In or around July 12, 2007, the Boston Regional Solicitor's Office contacted PBS requesting that it sign a tolling agreement, which it signed; and this litigation ensued. (Attachment 14 is a true and correct copy of PBS's response to the Boston Office's oral invitation to submit an explanation as to why the Master Plan Document did not violate ERISA).

64. In an effort to resolve this case without the expense of litigation, PBS offered to settle this case by amending the Master Plan Document to specifically name an officer or

committee of the Employer sponsoring the Plan the Trustee with the obligation to monitor and collect delinquent contributions. The DOL counter-offered PBS's offer. Attachment 12 is a true and correct copy of PBS's offer and proposed amendment to the Master Plan Document, incorrectly dated January 16, 2007. Correct date was January 16, 2008). DOL's unreasonable counteroffer was rejected. (Attachment 13 is a true and correct copy of the DOL's counteroffer).

65. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: April 7, 2008

*Travis West*
Travis West

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ William T. Hogan III